******************************************

The "officially released" date that appears near the beginning of an opinion is the date the opinion will be published in the Connecticut Law Journal or the date it is released as a slip opinion. The operative date for the beginning of all time periods for the filing of postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying an opinion that appear in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced or distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************

# ANDRE DESMOND WHITE *v.* COMMISSIONER OF CORRECTION
## (AC 46901)

Moll, Westbrook and Eveleigh, Js.

*Syllabus*

The petitioner, who had been convicted after a jury trial of home invasion, robbery and other crimes, appealed, on the granting of certification, from the habeas court's judgment denying his petition for a writ of habeas corpus. He claimed, inter alia, that the court improperly rejected a freestanding constitutional claim, pursuant to *McCoy* v. *Louisiana* (584 U.S. 414), that his criminal trial counsel, M, violated his sixth amendment right to client autonomy by effectively conceding his guilt to a charge of conspiracy to commit burglary in the first degree during closing argument to the jury without the petitioner's consent. *Held*:

The petitioner failed to preserve a freestanding *McCoy* claim for appellate review because it was not distinctly raised before or decided by the habeas court, as the petitioner pleaded M's alleged concession of guilt in a count of the habeas petition labeled as sounding in ineffective assistance of counsel, and, even if a *McCoy* claim had been properly preserved, this court was unpersuaded that a *McCoy* violation existed, as the petitioner never made an intransigent and unambiguous objection to M regarding a concession of guilt, and M did not concede the petitioner's guilt to the jury but, rather, stated several times that the petitioner was not guilty as part of a strategic attempt to provide a more favorable view of the evidence.

The petitioner failed to establish that M's performance at trial was deficient such that it amounted to constitutionally ineffective assistance.

The habeas court correctly decided that M's closing argument and decision not to object to the prosecutor's contention that he had conceded the petitioner's guilt did not constitute deficient performance, as M reasonably could have believed it was essential to mitigate the impact of the prosecutor's contention by arguing that the petitioner, in acting only as a messenger between the conspirators, lacked the specific intent for the jury to find him guilty of conspiracy, and, had M decided to object to the prosecutor's argument, it could have had the undesirable effect of focusing the jury's attention on that argument.

This court concluded, contrary to the petitioner's claim, that M's cross-examination of one of the petitioner's coconspirators, D, fell within the wide range of acceptable performance, as M emphasized to the jury that D faced multiple serious charges and had received a very favorable deal from the state by agreeing to testify against the petitioner, and M's decision not

to object to the admission into evidence of D's cooperation agreement with the state was not objectively unreasonable or prejudicial to the petitioner.

The petitioner failed to identify any evidence in support of his claim that M rendered ineffective assistance in failing to seek the dismissal of all charges against the petitioner on the ground that the state had recorded his prison phone calls that were made during the time he was self-represented or to suppress the state's use of those recordings, as the phone calls, rather than reflecting possible trial strategy, formed the basis of a witness tampering charge against the petitioner, and M's objections to the admission of those phone calls were overruled.

The habeas court properly denied the petitioner's claim that M rendered ineffective assistance in failing to object to the trial court's canvass of the petitioner regarding the waiver of his right to self-representation and its appointment of M as full counsel, as M, who was acting as standby counsel at the time of the canvass, had no sixth amendment duty to object, and the petitioner's insistence that he would have represented himself had he been permitted to do so was belied by the record, which reflected his clearly expressed desire to be represented by counsel.

The habeas court did not abuse its discretion by excluding as irrelevant D's testimony at the habeas trial that the handgun the perpetrators used in the home invasion was fake, as the operability of the gun was not an essential part of the state's case during the criminal trial, and evidence had been admitted at the criminal trial through the victim's testimony that the perpetrators had in their possession the victim's long guns, which they stole during the home invasion and which the victim had recently used, from which the jury could reasonably infer operability, and, even if the inquiry of D were relevant, the exclusion of his testimony regarding the gun was harmless.

Argued March 13—officially released October 28, 2025

*Procedural History*

Amended petition for a writ of habeas corpus, brought to the Superior Court in the judicial district of Tolland and tried to the court, *M. Murphy, J.*; thereafter, the petition was withdrawn in part; judgment denying the petition, from which the petitioner, on the granting of certification, appealed to this court. *Affirmed.*

*Vishal K. Garg*, assigned counsel, for the appellant (petitioner).

*Timothy F. Costello*, supervisory assistant state's attorney, with whom, on the brief, were *David R. Shannon*, state's attorney, *Angela R. Macchiarulo*, supervisory assistant state's attorney, and *Linda F. Rubertone*, senior assistant state's attorney, for the appellee (respondent).

*Opinion*

WESTBROOK, J. The petitioner, Andre Desmond White, appeals, following the granting of his petition for certification to appeal, from the judgment of the habeas court denying his amended petition for a writ of habeas corpus. The petitioner was convicted following a jury trial of home invasion in violation of General Statutes § 53a-100aa (a) (1), conspiracy to commit burglary in the first degree in violation of General Statutes §§ 53a-48 and 53a-101 (a) (3), robbery in the first degree in violation of General Statutes § 53a-134 (a) (2), robbery in the first degree in violation of § 53a-134 (a) (4), and tampering with a witness in violation of General Statutes § 53a-151. He claims on appeal that the court improperly (1) denied his freestanding constitutional claim asserting, pursuant to *McCoy* v. *Louisiana*, 584 U.S. 414, 138 S. Ct. 1500, 200 L. Ed. 2d 821 (2018), that his criminal trial counsel violated his right to client autonomy under the sixth amendment to the United States constitution by effectively conceding the petitioner's guilt to the conspiracy to commit burglary charge during closing argument without obtaining his consent to do so and despite his desire to maintain his innocence; (2) concluded that his criminal trial counsel did not provide ineffective assistance by (a) conceding the petitioner's guilt during closing argument and/or failing to object to the prosecutor's characterization of that concession during rebuttal closing argument; (b) failing to attack adequately the credibility of one of the petitioner's alleged coconspirators, Trayvon Dunning, during Dunning's cross-examination, or to object to the

admission into evidence of an unredacted copy of a cooperation agreement between Dunning and the state in exchange for Dunning's testimony against the petitioner; (c) failing to seek the dismissal of all charges on the ground that the state had monitored and recorded his prison telephone calls while the petitioner was self-represented and failing to seek to suppress the state's use of such recordings; and (d) failing to object to the trial court's canvass regarding his waiver of his right to self-representation; and (3) excluded as irrelevant Dunning's proffered testimony that the gun used during the commission of the underlying crimes was fake. For the reasons that follow, we reject the petitioner's claims and affirm the judgment of the habeas court.

In the petitioner's direct criminal appeal, this court set forth the following facts that the jury reasonably could have found with respect to the underlying convictions. See *State* v. *White*, 195 Conn. App. 618, 622–26, 226 A.3d 1066, cert. denied, 335 Conn. 906, 227 A.3d 77 (2020). "Early in 2013, the [petitioner], Henry Le, and [Dunning] were serving time as inmates at the same correctional facility. During this time, the three men agreed to commit home invasions following their release from prison.[1] . . . The men agreed that they

---

[1] "In several telephone conversations, the [petitioner] made statements while incarcerated that tended to implicate him in the home invasion. Two months prior to his release, the [petitioner] had a telephone conversation with his mother in which they discussed financial matters. During [that] conversation, the [petitioner] stated, 'I'm coming across a bunch of money when I get out, that's why I gotta get out.' In a telephone conversation with Le that took place on March 23, 2013, the [petitioner] referred to his imminent release from prison. He stated that Dunning was going to be 'ready' and that he would tell Dunning that Le had 'everything set up.' In a telephone conversation with his father that occurred on February 7, 2015, while he was incarcerated and awaiting trial, the [petitioner] stated that he had his upcoming case 'in the palm of his hand.' The [petitioner], revealing his knowledge of the crime, also stated that Le, who had accepted a guilty plea, had 'copped out' and was 'the mastermind.' " *State* v. *White*, supra, 195 Conn. App. 622–23 n.2.

would identify a suitable victim in public, follow the victim home, and commit a robbery at his or her residence. [Following their release, and] [i]n preparation to carry out their plan, in early April, 2013, they purchased items at a home improvement store, including masks, gloves, and zip ties.

"Late in the day on April 7, 2013, Dunning was driving an automobile on Interstate 84 in Hartford, and the [petitioner] and Le were his passengers. The three men observed the victim, Peter Brown, who was driving a BMW sport utility vehicle. The men decided to follow the victim after observing that he appeared to be alone, that he was a white male in his forties or fifties, and he was driving an expensive automobile. The men followed the victim from Hartford to his residence in New Hartford. . . .

"As the victim approached the back door of his residence, the [petitioner], Le, and Dunning, all of whom had their faces concealed, confronted him. . . . [O]ne of [the three] was brandishing a gun. . . . The men ordered the victim to give them his wallet and his cell phone. At gunpoint, the victim complied. . . . After the victim informed them that nobody else was at home and that he did not have an alarm system, the men forced the victim inside his residence.

"For the next forty-five to fifty minutes, the [petitioner], Dunning, and Le confined the victim to a chair in his kitchen. They searched the contents of an overnight bag that the victim had been carrying. They repeatedly asked the victim if he owned a safe, to which he replied, no. They removed a credit card and an automatic teller machine (ATM) card from his wallet. One of the men demanded the victim's ATM card's pin number. . . . After the victim provided the pin number, Le demanded the keys to the victim's automobile, asked him where the nearest ATM was located, and left the

residence. Le returned to the victim's residence a short time later after having withdrawn funds from the victim's bank account at an ATM in New Hartford.

"While one of the three men held the victim at gunpoint in his kitchen, they each took turns ransacking every room of his residence in search of valuables. The men brought various items to the kitchen. Thereafter, Dunning parked his automobile in the victim's driveway. While the victim continued to be held at gunpoint, as he had been throughout the entire incident, the men carried several of the victim's possessions to Dunning's automobile. . . .

"They then quickly fled from the scene in Dunning's automobile. The victim went to his neighbor's residence to request help. The victim's neighbor called 911, and the police arrived on the scene quickly thereafter.

"Following the [petitioner's] arrest and while he was awaiting trial . . . he had conversations with others in an attempt to persuade Dunning not to testify against him." (Footnote in original; footnotes omitted.) Id., 622–25. "Dunning [nevertheless] testified on behalf of the state at trial." Id., 626.

The trial court appointed Attorney Dennis P. McDonough of the Office of the Public Defender to represent the petitioner at trial.[2] The jury found the petitioner guilty of all charges. By way of a special interrogatory,

---

[2] The record shows that Attorney John Cizik, Jr., of the Office of the Public Defender, initially represented the petitioner from the time of his arraignment on August 9, 2013, until June 9, 2015, when the petitioner elected to represent himself. The trial court later appointed McDonough as standby counsel. In January, 2017, shortly before trial, the petitioner waived his right to self-representation and moved to have counsel appointed. In response, the court appointed McDonough to represent the petitioner. On the day of jury selection, McDonough filed a motion to withdraw from the case. Although the petitioner consented to the withdrawal and told the court that he wanted a new attorney, the court denied McDonough's motion to withdraw, and McDonough represented the petitioner throughout the trial.

the jury also found that the petitioner had committed the home invasion and robbery with the use of a firearm in violation of General Statutes § 53-202k. Id., 621 n.1. The petitioner received a total effective sentence of thirty years of incarceration, fifteen years of which was a mandatory minimum, execution suspended after twenty years, followed by five years of probation. Id.

The petitioner appealed to this court from the judgment of conviction. Id., 621. In March, 2018, while his direct appeal remained pending, he commenced the present habeas action. On August 13, 2021, his appointed counsel filed the operative amended petition for a writ of habeas corpus, which contained three counts. Count one alleged that his trial counsel, McDonough, had provided ineffective assistance. The petitioner alleged multiple specifications of purported deficient performance by McDonough, including that, "[d]uring closing arguments, [McDonough] effectively conceded the petitioner's guilt to certain of the charges brought against him, without the petitioner's consent, in violation of the rule described in *McCoy* v. *Louisiana*, [supra, 584 U.S. 417]."[3] Counts two and three raised

[3] As the habeas court set forth in its memorandum of decision, filed July 18, 2023, the petitioner alleged in his operative petition that McDonough had provided ineffective assistance by "(1) failing to conduct an adequate investigation into the facts and circumstances underlying the charges brought against the petitioner; (2) failing to adequately cross-examine, impeach, or otherwise undermine the credibility of [Dunning]; (3) failing to raise, claim, prove or argue the potential defense to robbery in the first degree that the petitioner and his alleged coconspirators did not possess or use an operable firearm during the alleged robbery; (4) conceding the petitioner's guilt to certain of the charges brought against him without the petitioner's consent; (5) failing to object to the prosecuting authority's comments during closing arguments vouching for Dunning's credibility; (6) failing to anticipate that his comments during closing arguments would invite the prosecuting authority's comments vouching for Dunning's credibility; (7) failing to object to the admission into evidence of the entire, unredacted cooperation agreement between Dunning and the prosecuting authority; (8) failing to move to dismiss the charges against the petitioner due to the prosecuting authority's surveillance of the petitioner's efforts to prepare a defense while representing himself; (9) failing to file a motion in limine

freestanding due process claims.[4] The respondent, the Commissioner of Correction, filed a return, leaving the petitioner to his proof on his allegations and asserting several defenses, including procedural default as to counts two and three.[5]

The habeas court, *M. Murphy, J.*, conducted a trial over three days. The petitioner testified and called as

precluding the state from presenting any evidence derived from its surveillance of the petitioner while he was representing himself; (10) failing to move to disqualify the state's attorney's office that directed and/or was aware of the surveillance of the petitioner by the prosecuting authority while the petitioner was representing himself; (11) failing to argue that the petitioner's alleged home invasion and robbery were not accomplished using a firearm and therefore not eligible for the sentencing enhancement contained in . . . § 53-202k; (12) failing to object to the trial court's canvass of the petitioner indicating that, by electing to have trial counsel represent him, the petitioner was forever giving up his right to resume representing himself in this matter; (13) failing to object to the court's decision to sentence the petitioner to thirty years instead of twenty-five years when the court offered no explanation for the change in sentence following a recess at the request of the prosecuting authority; and (14) failing to adequately advise the petitioner regarding the attractiveness of the court's plea offer to the petitioner, which consisted of an offer of thirty years, suspended after ten to fourteen years with a right to argue for the specific amount of years, with five years of probation."

In addition, the petitioner alleged that McDonough had rendered ineffective assistance by "failing to (1) object to the identification of the petitioner from security camera footage; (2) move to suppress the petitioner's identification from security camera footage; (3) object to the admissibility, for lack of relevance, of a Coinstar receipt offered into evidence against the petitioner; (4) object to the admissibility, for lack of relevance, of certain shotgun ammunition seized from the house where the petitioner's family lived; (5) object to the court's determination that the petitioner's conduct met the eligibility requirements for the sentencing enhancement contained in § 53-202k, as opposed to [requiring] the enhancement to be found by the jury." The petitioner withdrew these five additional specifications of ineffective assistance of counsel prior to the commencement of trial.

[4] "In habeas corpus proceedings, courts often describe constitutional claims that are not tethered to a petitioner's sixth amendment right to counsel as freestanding." (Internal quotation marks omitted.) *Saunders* v. *Commissioner of Correction*, 343 Conn. 1, 25–26, 272 A.3d 169 (2022).

[5] The petitioner does not challenge the denial of counts two and three on appeal, and, accordingly, it is unnecessary to discuss them further.

witnesses State's Attorney David R. Shannon, who prosecuted the criminal trial; Dunning; Attorney Lisa J. Steele, who represented the petitioner in his direct criminal appeal; and McDonough. The petitioner submitted into evidence several exhibits, including the transcripts of the criminal trial and, on March 21, 2013, filed a posttrial brief. That same day, the respondent filed with the court a notice indicating that, because he believed the petitioner had failed to proffer any evidence in support of his claims, the respondent would rest on the evidence presented at trial.

On July 18, 2023, the habeas court issued a memorandum of decision denying the petition in its entirety.[6] With respect to six of the petitioner's specifications of ineffective assistance—specifically, those pertaining to McDonough's closing arguments, his cross-examination of Dunning, the petitioner's exclusion from an in-chambers discussion during sentencing, law enforcement's surveillance of the petitioner when he was incarcerated and self-represented, the court's canvass regarding the petitioner's right to self-representation, and McDonough's advice regarding a plea offer—the court concluded that the petitioner had failed to sustain his burden of establishing either deficient performance or prejudice, as required to prove a claim of ineffective assistance of counsel under *Strickland* v. *Washington*, 466 U.S. 668, 687, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). With respect to the remainder of the petitioner's specifications of ineffective assistance, the court found that the petitioner had failed to address them in his posttrial brief, leading the court to conclude: "As a

---

[6] The habeas court simultaneously denied a petition for a new trial that the petitioner had filed pursuant to Practice Book § 42-55 in a separate docket. The record shows that, on April 4, 2023, the parties had filed a joint stipulation in which they agreed that the court's resolution of the habeas matter would govern the outcome of the petition for a new trial. The petitioner does not challenge the court's ruling on the petition for a new trial in the present appeal.

result, this court considers these claims abandoned. To the extent they are not deemed abandoned, they are without factual foundation and support in the record." The court subsequently granted the petitioner's petition for certification to appeal. This appeal followed. Additional facts and procedural history will be set forth as necessary.

I

The petitioner first claims that the habeas court improperly rejected his freestanding constitutional claim in which he invoked *McCoy* v. *Louisiana*, supra, 584 U.S. 414, for the proposition that his sixth amendment right to client autonomy was violated because, during closing argument to the jury, McDonough allegedly conceded his guilt to the conspiracy to commit burglary charge without his consent and against his desire to maintain his innocence. The respondent contends that the petitioner never raised a freestanding *McCoy* claim before the habeas court and that, even if we were to conclude that he had done so and that the claim effectively was decided and rejected by the court, the petitioner cannot prevail on his claim under the facts of this case. On the basis of our careful review of the pleadings, record, and relevant case law, we agree with the respondent that the plaintiff has not properly preserved or established a *McCoy* violation.

The following additional facts and procedural history are relevant to this claim. At the criminal trial, the prosecutor, as part of his initial closing argument to the jury, replayed excerpts of the audio recordings of the petitioner's phone calls with his mother, father, and Le, in which, the prosecutor argued, the petitioner had made incriminating statements tying him to the home invasion scheme. See footnote 1 of this opinion.

In his closing argument, McDonough responded in relevant part: "In the audios that you heard, you heard

my client say certain things, *but he never admitted participation in a crime, actually said he didn't do it*. He sat there at break or at lunch with [Dunning and Le] and listened to them put together their plan. He would know which one was the smarter of the two. He would know which one would be the one who was the major planner so he could say he wasn't—who was the mastermind, and we know who the mastermind is.

"*There's no evidence of guilt. It's evidence of maybe knowledge*. He knew what they were planning. He didn't want to take part in it, relayed information by phone calls. He also said in the pre—I believe it was his mother then—I already have the money. If you already have the money, then there's no reason to steal the money. The crime hadn't yet been committed but he had the money, but he does not have to prove where he had the money, how he got the money and how much money it was, but he does say, 'I already had the money,' to his mother in the pre-crime phone call, which supports the fact that *he didn't really take part in the crime*.

"I believe it's still significant, when he's talking to [Le], he doesn't know when he's getting out of jail. [Le] wants [Dunning] to know he's setting it up. He tells that to [the petitioner] to tell to [Dunning]. Not knowing whether [the petitioner's] getting out or not. You can't take isolated little snippets out of—from years of phone calls and say that is beyond reasonable doubt, that's participation in a crime. It just isn't logical. It isn't right.

"The phone call with his father you can infer that he knew that [Le and Dunning] were planning a crime. He relays that to his father, and that was an uncomfortable phone call for many reasons, but *it doesn't make* [*the petitioner*] *a criminal*. Just mere knowledge does not make you a participant in a crime. It's things you know that's going to happen, or maybe you know it did happen and who did it." (Emphasis added.)

In his rebuttal argument, the prosecutor stated in relevant part: "So, what did [McDonough] just tell you? He just told you my client's guilty of burglary in the first degree because he says they sat in the cafeteria, they talk about it in front of him, planning a home invasion, and then we know for a fact that he called up [Le] and conveyed a message between [Dunning and Le]. Two of the people [McDonough] is admitting are conspirators in this home invasion. So, really, what you're saying is, there's four conspirators. [The petitioner's brother], [Dunning], [Le] and my client, because he relayed a message and that's an overt act in furtherance of the conspiracy. So, right then and there—boom— the elements have been met. But that's not this case theory in case, and I don't think that that's what the evidence bears out.

\* \* \*

"If you go along with what [McDonough] is saying, then [the petitioner] literally sat there while two people planned a home invasion robbery and did nothing about it. Not only did he do nothing about it, he helped by relaying messages, and then, after this serious crime happened, he went and profited from it. He didn't say, when the police interviewed him, you know what, that is me with [Le] and I gotta tell you they were—they were talking about doing this when they were in jail. I didn't really think they'd do it, or I didn't want anything to do with it. They were talking about it in jail. I didn't want to say 'no, guys, that's the wrong thing to do,' because I'm in jail and I want to seem like a tough guy."

We next set forth our standard of review and a discussion of *McCoy* v. *Louisiana*, supra, 584 U.S. 414, including our Supreme Court's recent interpretation and application of the *McCoy* rule in *Grant* v. *Commissioner of Correction*, 345 Conn. 683, 287 A.3d 124 (2022). "In *McCoy*, the United States Supreme Court recognized a

criminal defendant's sixth amendment right to autonomy in deciding the objectives of his defense and concluded that the right prohibits defense counsel from admit[ting] [a] client's guilt of a charged crime over the client's *intransigent objection to that admission.* . . . [If] a client *expressly asserts* that the objective of his defense is to maintain innocence of the charged criminal acts, his lawyer must abide by that objective and may not override it by conceding guilt. . . .

"The facts in *McCoy* were not in dispute. The petitioner, Robert Leroy McCoy, was charged with three counts of first degree murder. . . . Throughout the proceedings, McCoy maintained his innocence, insisting that he was out of state at the time of the killings. . . . McCoy's defense counsel, Larry English, concluded that the evidence against McCoy was overwhelming and that, [in the absence of] a concession at the guilt stage that McCoy was the killer, a death sentence would be impossible to avoid at the penalty phase. . . .

"McCoy was furious when English told him that he intended to concede McCoy's guilt to the murders. . . . Two days before trial was set to begin, McCoy sought to terminate English's representation, and English similarly requested that the court remove him as McCoy's counsel, given their disagreement over trial strategy. . . . The trial court denied both requests . . . and, subsequently, English argued to the jury that there was no way reasonably possible that [it] could hear the prosecution's evidence and reach any other conclusion than . . . McCoy was the cause of these individuals' death[s] . . . and that the evidence is unambiguous [that McCoy] committed three murders. . . . Thereafter, McCoy took the witness stand to assert his innocence and to [press] an alibi difficult to fathom. . . . The jury found McCoy guilty on all three murder counts, and, following the penalty phase hearing, the trial court

sentenced him to death in accordance with the jury's verdicts. . . . The Louisiana Supreme Court subsequently upheld the trial court's ruling that English had authority to concede McCoy's guilt, despite McCoy's opposition to any admission of guilt, concluding that [t]he concession was permissible . . . because [English] reasonably believed that admitting guilt afforded McCoy the best chance to avoid the death [penalty]. . . .

"The United States Supreme Court reversed the Louisiana Supreme Court's judgment, holding that a defendant has the right to insist that counsel refrain from admitting guilt, even when counsel's [experienced based] view is that confessing guilt offers the defendant the best chance to avoid the death penalty. . . . The court explained that, although the role of counsel necessarily entails making certain [t]rial management and strategic decisions concerning what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence, other decisions are reserved for the client alone, such as whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal. . . .

"Autonomy to decide that the objective of the defense is to assert innocence belongs in this latter category. . . . These are not strategic choices about how best to achieve a client's objectives; they are choices about what the client's objectives in fact are. . . .

"In reaching its decision [in *McCoy*], the [United States Supreme Court] distinguished *Florida* v. *Nixon*, 543 U.S. 175, 125 S. Ct. 551, 160 L. Ed. 2d 565 (2004), a case involving a *Strickland* claim in which the [c]ourt considered whether the [c]onstitution bars defense counsel from conceding a . . . defendant's guilt at trial

when [the] defendant, informed by counsel, neither consents nor objects . . . .'' (Citations omitted; emphasis altered; internal quotation marks omitted.) *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 694–96. "In *Nixon*, the court concluded that, [w]hen counsel informs [a] defendant of the strategy counsel believes to be in the defendant's best interest and the defendant is unresponsive, counsel's strategic choice is not impeded by any blanket rule demanding the defendant's explicit consent. . . .

"The court [in *McCoy*] explained that the distinguishing factor between *McCoy* and *Nixon* was that, unlike the defendant in *Nixon*, who never verbally approved or protested counsel's proposed approach . . . McCoy vociferously insisted that he did not engage in the charged acts and adamantly objected to any admission of guilt. . . . In such circumstances, the court determined, English was constitutionally obligated to honor McCoy's wish to pursue a defense of actual innocence, no matter how ill-advised or weak that defense may have been." (Citations omitted; internal quotation marks omitted.) Id., 697.[7] In considering whether a *McCoy* violation has occurred, the subordinate facts found by the habeas court are subject to the clearly erroneous standard of review, but whether those facts constitute a violation of the petitioner's sixth amendment right to autonomy as set forth in *McCoy* presents a mixed question of law and fact over which our review is plenary. Id., 694.

In *Grant*, the issue before our Supreme Court was whether the habeas court in that case properly had

---

[7] The court in *McCoy* held that, unlike a violation of the right to the effective assistance of counsel, a violation of a defendant's sixth amendment right to autonomy is structural error that is not subject to harmless error review. See *McCoy* v. *Louisiana*, supra, 584 U.S. 427. In other words, once a violation is established, the defendant does not have to demonstrate prejudice to be entitled to a new trial. Id., 428.

concluded that the rule announced in *McCoy* was inapplicable because, although defense counsel had conceded during closing argument that the petitioner was guilty of manslaughter, there was no evidence in the record that counsel did so over an expressed objection from the petitioner. In affirming the judgment of the habeas court, our Supreme Court provided the following insight into its understanding of the scope of the rule announced in *McCoy*:[8] "The United States Supreme Court made clear in *McCoy* that the sixth amendment right to autonomy is implicated *only* when, over a defendant's *express objections*, counsel concedes the defendant's guilt to a charged offense. This limitation on the right to autonomy is evident throughout the court's decision but especially in the court's restatement of the issue presented: whether it is unconstitutional to allow defense counsel to concede guilt over the defendant's *intransigent and unambiguous objection.* . . . Because no such objection was made [by the petitioner in *Grant*]—indeed, [he] does not contend otherwise—the habeas court correctly determined that [the petitioner's] right to autonomy was not implicated under the facts of this case." (Emphasis altered; footnote omitted; internal quotation marks omitted.) Id., 698–99. In a footnote, the court in *Grant* suggested that, if defense counsel fails to get a defendant's approval before conceding guilt to a charge, such a failure properly is challenged via an ineffective assistance of counsel claim, *not as a*

---

[8] As aptly observed by the Harvard Law Review: "After *McCoy*, it is unclear what circumstances amount to *McCoy* violations. The [United States Supreme] Court held that 'a defendant has the right to insist that counsel refrain from admitting guilt,' without addressing key threshold questions: What constitutes a concession of guilt? How much objection is necessary to trigger *McCoy*, given the gaping gray area between *Nixon*'s unresponsive defendant and *McCoy*'s strenuous objector? Must the defendant's objection be on the trial record? The [c]ourt declined to address whether *McCoy*'s rule applies in scenarios less explicit than the facts of *McCoy* itself." (Footnote omitted.) Note, "The Supreme Court—Leading Cases," 132 Harv. L. Rev. 277, 383 (2018).

*stand-alone McCoy violation.* See id., 698–99 n.8. The court explained: "In his posttrial brief in the habeas court, the petitioner conceded that his case was distinguishable from *McCoy* because, unlike the petitioner in *McCoy*, he did not object to [counsel's] concession. The petitioner argued, however, that the record reasonably support[ed] a finding that [counsel] failed to inquire with the petitioner prior to [conceding his guilt] . . . . The petitioner then argued that [i]t is tautological that, if counsel is not free to concede to a client's guilt for strategic purposes over a client's objection, counsel should similarly not be free to do so without inquiring with the client at all. Since *McCoy*, [however], courts that have considered similar claims have held that *they should be analyzed within the Strickland ineffective assistance of counsel framework*."[9] (Emphasis added; internal quotation marks omitted.) Id., 698–99.

---

[9] In support of its position, the court in *Grant* cited the following cases: "See, e.g., *Harvey* v. *State*, 318 So. 3d 1238, 1239–40 (Fla. 2021) (in absence of express objection to counsel's concession, claim that counsel conceded guilt without consulting defendant implicates right to effective assistance of counsel under *Nixon* and *Strickland*, not right to autonomy under *McCoy*), cert. denied,     U.S.     , 142 S. Ct. 1110, 212 L. Ed. 2d 8 (2022); *Harper* v. *State*, Docket No. 20-1537, 2022 WL 1100280, *4–7 (Iowa App. April 13, 2022) (decision without published opinion, 978 N.W.2d 99) (same); see also *Palmer* v. *Garrett*, Docket No. 3:18-cv-00245-HDM-CLB, 2022 WL 3684713, *7 (D. Nev. August 25, 2022) (concluding that *McCoy* was inapplicable to claim that counsel did not adequately advise petitioner of ramifications of concession strategy because '*McCoy* addressed a [defendant's] autonomy, not counsel's competence . . . and any claims challenging trial counsel's advice could have been raised in [the petitioner's] first . . . [habeas] petition based on *Nixon*' (citation omitted; internal quotation marks omitted)). See generally *In re Somerville*, Docket No. 53586-6-II, 2020 WL 6281524, *4 (Wn. App. October 27, 2020) (decision without published opinion, 14 Wn. App. 2d 1068) ('*McCoy* points to *Nixon* for the proposition that counsel has a duty to develop a trial strategy and [to] discuss it with his or her client, but *McCoy* . . . does not hold that there is an inherent violation of a defendant's autonomy to decide a defense objective if that first duty is violated')." *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 699 n.8.

Accordingly, in those cases in which counsel failed to give a defendant notice of counsel's intent to make a concession of guilt or, having notice, the defendant failed to raise an objection to a concession made by counsel,

A

Turning to the present case, we first address whether the petitioner properly preserved for appellate review his freestanding *McCoy* claim. The petitioner claims that, even if he did not expressly plead a violation of his sixth amendment right to client autonomy, he did invoke *McCoy* by name as part of his claim of ineffective assistance of counsel and that such a reference was "more than adequate to properly plead the *McCoy* claim . . . ." The respondent contends that the petitioner's "attempt to recast his claim as one of client autonomy . . . is a new invention on appeal and, therefore, should be rejected."

"It is fundamental that claims of error must be distinctly raised and decided in the [habeas] court before they are reviewed on appeal. As a result, Connecticut appellate courts will not address issues not decided by the [habeas] court." (Internal quotation marks omitted.) *Bozelko* v. *Commissioner of Correction*, 162 Conn. App. 716, 717 n.1, 133 A.3d 185, cert. denied, 320 Conn. 926, 133 A.3d 458 (2016); see also *State* v. *Miller*, 186 Conn. 654, 658, 443 A.2d 906 (1982) ("[o]nly in the most exceptional circumstances will this court consider even a constitutional claim not properly raised and decided in the trial court"). The preservation requirement is codified in Practice Book § 60-5, which provides in relevant part that our appellate courts "shall not be bound to consider a claim unless it was distinctly raised at the trial . . . ." The requirement that a claim be distinctly raised "means that it must be so stated as to bring to the attention of the court the *precise* matter on which its decision is being asked. . . . As our Supreme Court has explained, [t]he reason for the rule is obvious: to permit a party to raise a claim on appeal

the proper lens for analysis is an ineffective assistance of counsel claim, not a freestanding constitutional claim.

that has not been raised at trial—after it is too late for the trial court or the opposing party to address the claim—would encourage trial by ambuscade, which is unfair to both the trial court and the opposing party." (Citations omitted; emphasis added; internal quotation marks omitted.) *U.S. Bank National Assn.* v. *Iaquessa,* 132 Conn. App. 812, 814–15, 34 A.3d 1005 (2012).

A petition for a writ of habeas corpus is "in the nature of a pleading . . . . [T]he modern trend, which is followed in Connecticut, is to construe pleadings broadly and realistically, rather than narrowly and technically. . . . [T]he [petition] must be read in its entirety in such a way as to give effect to the pleading *with reference to the general theory upon which it proceeded,* and do substantial justice between the parties. . . . As long as the pleadings provide sufficient notice of the facts claimed and the issues to be tried and do not surprise or prejudice the opposing party, we will not conclude that the [petition] is insufficient to allow recovery." (Citation omitted; emphasis added; internal quotation marks omitted.) *Anderson* v. *Commissioner of Correction*, 114 Conn. App. 778, 786, 971 A.2d 766, cert. denied, 293 Conn. 915, 979 A.2d 488 (2009).

Here, the operative amended petition for a writ of habeas corpus contained three counts. Count one clearly is labeled as sounding in ineffective assistance of counsel. Although the petitioner alleges therein that counsel violated the rule recognized in *McCoy*, he does so not in the guise of pleading a freestanding constitutional claim but as one of several examples of allegedly deficient performance by McDonough. As our Supreme Court made clear in *Grant,* however, not every assertion or allegation that counsel improperly conceded a defendant's guilt implicates the sixth amendment right to autonomy at issue in *McCoy.* Rather, such claims are more properly analyzed under the *Strickland* ineffective assistance of counsel framework, which is precisely

how the petitioner raised and pleaded his claim before the habeas court. We disagree with the petitioner's insistence that the distinction between the right to autonomy and the right to the effective assistance of counsel is "illusory . . . ." Moreover, given that counts two and three of the operative petition pleaded in straightforward fashion freestanding due process claims, it is both appropriate and logical to conclude that, had the petitioner wanted to raise and plead a freestanding *McCoy* claim rather than a *Strickland* ineffective assistance claim, his counsel knew how to do so.

We simply are not convinced that the petitioner pleaded a freestanding *McCoy* claim, and the habeas court certainly did not rule on such a claim. This court previously has declined to review a claim asserting an improper concession under *McCoy* where such a claim was not raised before and decided by the habeas court. See *John B.* v. *Commissioner of Correction*, 194 Conn. App. 767, 784 n.13, 222 A.3d 984 (2019) (concluding that record was inadequate to review *McCoy* claim that was not raised before or decided by habeas court), cert. denied, 334 Conn. 919, 222 A.3d 513 (2020); *Leon* v. *Commissioner of Correction*, 189 Conn. App. 512, 521, 208 A.3d 296 (agreeing with respondent that "petitioner's attempt to cast his claim as one of client autonomy, rather than ineffective assistance [as pleaded], is a new invention on appeal which should not be entertained" (internal quotation marks omitted)), cert. denied, 332 Conn. 909, 209 A.3d 1232 (2019).[10] Although we could end our analysis here,[11] because the United States

_____

[10] The only Connecticut appellate cases reaching the merits of an alleged *McCoy* violation are *Grant* v. *Commissioner of Correction*, supra, 345 Conn. 694–99, and *Baltas* v. *Commissioner of Correction*, 210 Conn. App. 167, 173–75, 269 A.3d 957, cert. denied, 342 Conn. 911, 271 A.3d 1039 (2022), in which this court concluded that the petitioner's autonomy claim under *McCoy* failed because trial counsel did not concede his guilt.

[11] In direct criminal appeals, unpreserved constitutional claims may be reviewed pursuant to *State* v. *Golding*, 213 Conn. 233, 239–40, 567 A.2d 823 (1989), as modified by *In re Yasiel R.*, 317 Conn. 773, 781, 120 A.3d 1188 (2015). As our Supreme Court recently reiterated, however, *Golding* review

Supreme Court has deemed violations of *McCoy* to be structural in nature, we are reluctant to decline review solely on preservation grounds.

B

Even if we were to conclude that, read broadly, the petitioner's invocation of *McCoy* in his claim of ineffective assistance of counsel was adequate to have put the respondent and the habeas court on notice that he was asserting a freestanding *McCoy* claim and that the court impliedly denied that claim when it ruled in the respondent's favor on the habeas petition, the claim would nevertheless fail on the record before us. Our Supreme Court in *Grant* indicated that courts should strictly limit application of *McCoy* to those instances in which counsel has conceded a client's guilt in the face of a client's direct, clear, and unambiguous objection to counsel's so doing, a factual scenario for which the evidence is lacking in the present case.

It is not disputed that the petitioner did not accept a pretrial plea agreement against the advice of counsel, electing to maintain his innocence and proceed to trial. The petitioner directs our attention to McDonough's testimony at the habeas trial in which he agreed with habeas counsel that the petitioner "had strong opinions about his case" and stated that he did not "*think* [the petitioner] wanted to concede anything." (Emphasis added.) The petitioner, however, presented no evidence that McDonough ever discussed with the petitioner the content of his closing argument prior to addressing the jury, including the strategic choice of making certain

is not available to address claims that "arose during [a petitioner's] criminal trial and should have been presented to the habeas court as an additional basis for granting the writ of habeas corpus. . . . Instead, *Golding* review is available in a habeas appeal only for claims that challenge the actions of the habeas court." (Citation omitted; internal quotation marks omitted.) *Banks* v. *Commissioner of Correction*, 347 Conn. 335, 346–47, 297 A.3d 541 (2023).

factual concessions. Accordingly, unlike in *McCoy*, any concession that McDonough made in addressing the jury cannot reasonably be viewed as having been done in the face of a clearly expressed and intransigent objection by the petitioner. In other words, McDonough did not override or ignore a clearly expressed directive from his client not to pursue anything that would undermine a defense to the charges. Whether McDonough should have consulted with the petitioner about the strategy he pursued raises a performance issue that is more appropriately addressed in the context of a *Strickland* type claim. See part II A of this opinion.

### C

Finally, even if we overlook the preservation issue or that the record does not readily support a conclusion that the petitioner ever made an "intransigent and unambiguous objection" to his trial counsel regarding a concession of guilt; *McCoy* v. *Louisiana*, supra, 584 U.S. 420; the petitioner's purported freestanding *McCoy* claim also falters on the fact that McDonough did not expressly concede the petitioner's guilt to a charged offense. Having reviewed the closing arguments in their totality, we conclude that McDonough's argument cannot reasonably be characterized as conceding guilt on the charge of conspiracy to commit burglary in the first degree. Rather, we construe counsel's challenged statements as a strategic attempt to counter the evidence on which the prosecutor relied in his closing argument by providing the jury with a more favorable view of that evidence.

"A person is guilty of conspiracy under § 53a-48 (a) when, with intent that conduct constituting a crime be performed, he agrees with one or more persons to engage in or cause the performance of such conduct, and any one of them commits an overt act in pursuance of such conspiracy. To establish a violation of § 53a-48

(a), the state must prove that three essential elements are satisfied: (1) the accused intended that conduct constituting a crime would be performed; (2) the accused formed an agreement with one or more persons to engage in such conduct; and (3) any one of the coconspirators performed some overt act in furtherance of the conspiracy. . . . Conspiracy, then, is a specific intent crime, with the intent divided into two elements: [1] the intent to agree or conspire and [2] the intent to commit the offense which is the object of the conspiracy." (Citation omitted; internal quotation marks omitted.) *State* v. *Pond*, 315 Conn. 451, 467–68, 108 A.3d 1083 (2015).

McDonough did not directly or "effectively" concede the petitioner's guilt to having engaged in a conspiracy. To the contrary, McDonough expressly stated several times in his closing argument that the petitioner was *not* guilty. Through his arguments, McDonough tried to explain away the petitioner's incriminating statements in the audio recordings or to establish how these statements could be construed as consistent with his assertion of innocence. McDonough could not argue that the petitioner did not make the statements but could try to persuade the jury that the petitioner had acted as nothing more than a messenger of information between Dunning and Le, rather than as an actual participant in the home invasion scheme. Because nothing in McDonough's closing argument conceded that the petitioner had the specific intent to commit a burglary, he did not concede the petitioner's guilt on the conspiracy charge.

In summary, we conclude that the petitioner failed to preserve a freestanding *McCoy* claim because it was not distinctly raised before or decided by the habeas court. Moreover, even if the claim was properly preserved for appellate review, our plenary review of the record leaves us unpersuaded that a true *McCoy* violation existed on these facts.

## II

The petitioner next claims that the habeas court improperly determined that McDonough did not provide ineffective assistance by (1) conceding his guilt during closing argument to the jury and/or by failing to object to the prosecutor's characterization of that concession during rebuttal argument; (2) failing to attack adequately the credibility of the petitioner's coconspirator, Dunning, during Dunning's cross-examination, or to object to the admission into evidence of an unredacted cooperation agreement between Dunning and the state in exchange for Dunning's testimony against the petitioner; (3) not moving to dismiss all charges on the ground that the state had improperly monitored and recorded the petitioner's prison telephone calls during a period of time in which he was self-represented, and failing to seek to suppress the state's use of those recordings; and (4) failing to object to the trial court's canvass regarding the petitioner's waiver of his right to self-representation. For the reasons that follow, we conclude that the petitioner has failed to establish that McDonough's performance was deficient such that it amounted to constitutionally ineffective assistance of counsel.

We begin with well settled principles of law governing this claim, including our standard of review. "To succeed on a claim of ineffective assistance of counsel, a habeas petitioner must satisfy the two-pronged test articulated in *Strickland* v. *Washington,* [supra, 466 U.S. 687]. *Strickland* requires that a petitioner satisfy both a performance prong and a prejudice prong. . . . To satisfy the performance prong, the petitioner must establish that his counsel made errors so serious that [counsel] was not functioning as the counsel guaranteed the [petitioner] by the [s]ixth [a]mendment. . . . The petitioner must thus show that counsel's representation

fell below an objective standard of reasonableness considering all of the circumstances. . . . [A] court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the [petitioner] must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy. . . . Furthermore, the right to counsel is not the right to perfect counsel. . . .

"To satisfy the prejudice prong, a claimant must demonstrate that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. . . . A reasonable probability is a probability sufficient to undermine confidence in the outcome. . . . In its analysis, a reviewing court may look to the performance prong or to the prejudice prong, and the petitioner's failure to prove either is fatal to a habeas petition. . . .

"On appeal, [a]lthough the underlying historical facts found by the habeas court may not be disturbed unless they [are] clearly erroneous, whether those facts constituted a violation of the petitioner's rights [to the effective assistance of counsel] under the sixth amendment is a mixed determination of law and fact that requires the application of legal principles to the historical facts of [the] case. . . . As such, that question requires plenary review by this court unfettered by the clearly erroneous standard." (Internal quotation marks omitted.) *Walker* v. *Commissioner of Correction*, 230 Conn. App. 108, 114–15, 328 A.3d 665, cert. denied, 351 Conn. 910, 331 A.3d 158 (2025).

A

The petitioner first argues that McDonough provided ineffective assistance when he allegedly conceded the petitioner's guilt to the conspiracy charge during closing arguments to the jury and/or by failing to object to the

prosecutor's characterization of McDonough's argument as a concession during the prosecutor's closing rebuttal argument. The petitioner asserts that there was no reasonable strategic basis for McDonough's decision to concede that the petitioner had passed information between Le and Dunning or for McDonough's failure to object when the prosecutor stated in his rebuttal argument that McDonough "just told you [his] client's guilty of burglary . . . ." The petitioner further asserts that he was prejudiced by his counsel's allegedly deficient performance. In light of the circumstances, we disagree that McDonough's representation fell below an objective standard of reasonableness pursuant to *Strickland*.

As we discussed in part I of this opinion, we do not agree that McDonough effectively conceded the petitioner's guilt to any charged offense when he acknowledged that the petitioner had passed along messages between his alleged coconspirators. Because the prosecutor in his initial closing argument had replayed for the jury the audio recordings of the petitioner's prison telephone conversations that tended to demonstrate the petitioner's prior knowledge of the home invasion plot, McDonough reasonably could have believed that it was essential to the defense to attempt to mitigate the impact of such evidence by explaining in his closing argument that, rather than being a participant/coconspirator, the petitioner had acted only as a messenger of information. In other words, rather than conceding guilt, McDonough sought to convince the jury that the petitioner lacked the requisite specific intent needed for the jury to find him guilty of the conspiracy beyond a reasonable doubt.

Furthermore, we are unconvinced that McDonough's decision not to raise an objection to the prosecutor's characterization of his argument as a concession of guilt amounted to deficient performance. First, it is not

entirely clear what the basis of such an objection would have been. "[I]t is not improper for the prosecutor to comment upon the evidence presented at trial and *to argue the inferences that the jurors might draw therefrom.*" (Emphasis added; internal quotation marks omitted.) *Williams* v. *Commissioner of Correction*, 169 Conn. App. 776, 790, 153 A.3d 656 (2016). The prosecutor was clearly seeking to have the jury draw an inference of guilt on the basis of the petitioner's recorded statements, and it was fair rhetoric to suggest that McDonough's attempts to explain away the evidence misfired and amounted to a concession of guilt in the eyes of the state. Second, ordinarily, "[t]he decision of a trial lawyer not to make an objection is a matter of trial tactics, not evidence of incompetency." (Internal quotation marks omitted.) *Moore* v. *Commissioner of Correction*, 119 Conn. App. 530, 543, 988 A.2d 881, cert. denied, 296 Conn. 902, 991 A.2d 1103 (2010). McDonough testified at the habeas trial that he did not anticipate that the prosecutor would characterize his arguments as a concession of guilt, suggesting that he did not view his argument as such, and that objecting to the prosecutor's argument could have had the potential undesirable effect of focusing the jury's attention on the prosecutor's argument.

We have often repeated that "[c]losing arguments of counsel . . . are seldom carefully constructed in toto before the event; improvisation frequently results in syntax left imperfect and meaning less than crystal clear. . . . Therefore, because closing arguments often have a rough and tumble quality about them, some leeway must be afforded to the advocates in offering arguments to the jury in final argument. . . . [W]e must review the comments . . . in the context of the entire trial." (Internal quotation marks omitted.) *Langston* v. *Commissioner of Correction*, 104 Conn. App. 210, 223–24, 931 A.2d 967, cert. denied, 284 Conn. 941, 937 A.2d

697 (2007). Having viewed McDonough's closing arguments as a whole and in light of the entirety of the trial, we conclude that the habeas court correctly decided that his arguments as well as his decision not to object to the prosecutor's characterization of them on rebuttal did not constitute deficient performance. Accordingly, we need not consider *Strickland*'s prejudice prong. See, e.g., *Thompson* v. *Commissioner of Correction*, 184 Conn. App. 215, 228 n.5, 194 A.3d 831 ("[b]ecause we have decided the petitioner's claim on the basis of the performance prong, this court need not discuss the prejudice prong" of *Strickland*), cert. denied, 330 Conn. 930, 194 A.3d 778 (2018).

B

The petitioner next argues that McDonough provided ineffective assistance of counsel related to his cross-examination of Dunning. First, he contends that McDonough failed to adequately attack Dunning's credibility during his cross-examination, particularly by failing to expose the severity of the sentence that he avoided by entering into a cooperation agreement with the state. Second, the petitioner contends that McDonough should have objected to the admission into evidence of an unredacted copy of that cooperation agreement, portions of which the petitioner claims could have bolstered the credibility of Dunning's testimony.[12] We conclude that the petitioner has failed to meet his burden of establishing deficient performance.

The following additional facts are relevant to this aspect of the petitioner's claim. The cooperation agreement between Dunning and the state was entered into

---

[12] The petitioner also argues that McDonough failed to question Dunning about whether the handgun used during the home invasion was a fake gun. As we discuss more fully in part III of this opinion, whether the handgun used by the perpetrators was real was not relevant to the charges or to the theory of the defense, and, thus, McDonough's choice not to question Dunning about the gun was not objectively unreasonable, nor did it prejudice the petitioner.

evidence by the prosecutor at the petitioner's criminal trial. The agreement provided in relevant part that Dunning agreed to "cooperate completely and truthfully in any investigations, hearings, or trials relating to [the petitioner], including the giving of truthful sworn testimony." It further provided that, having pleaded guilty to the charges against him, Dunning faced a sentence of between seven and nine years of incarceration followed by special parole of between five and six years. According to the agreement, the sentence, which he ultimately received, would be determined "by the sentencing judge, the Honorable Kari Dooley, after consideration of the credibility of his testimony and other factors . . . ."

"An attorney's line of questioning on examination of a witness clearly is tactical in nature. [As such, this] court will not, in hindsight, second-guess counsel's trial strategy. . . . The fact that counsel arguably could have inquired more deeply into certain areas, or failed to inquire at all into areas of claimed importance, falls short of establishing deficient performance." (Internal quotation marks omitted.) *Ruiz* v. *Commissioner of Correction*, 195 Conn. App. 847, 861, 227 A.3d 1049, cert. denied, 335 Conn. 915, 229 A.3d 729 (2020). "Once an attorney makes an informed, strategic decision regarding how to cross-examine a witness, that decision is virtually unchallengeable." (Internal quotation marks omitted.) *Taft* v. *Commissioner of Correction*, 159 Conn. App. 537, 557, 124 A.3d 1, cert. denied, 320 Conn. 910, 128 A.3d 954 (2015).

As the habeas court aptly observed, during his cross-examination of Dunning, McDonough pursued a strategy of discrediting Dunning and attacking his credibility by eliciting testimony demonstrating that Dunning had lied to the police until the state offered him a cooperation agreement and by emphasizing that Dunning had

received a very favorable outcome in exchange for testifying that he committed the home invasion with the petitioner and Le.[13] McDonough asked Dunning about the specific charges against him that were dropped as a result of the cooperation agreement. Although he did not ask or present evidence that the charges Dunning avoided could have resulted in a maximum sentence of ninety years of incarceration, McDonough emphasized to the jury that Dunning had faced multiple serious charges and had received a very favorable deal by agreeing to testify against the petitioner. We cannot conclude that McDonough's failure to ask Dunning about the specific potential sentences attached to the charges that he avoided rendered his cross-examination less effective in the eyes of the jurors such that his performance was constitutionally deficient. Having reviewed both the trial and habeas proceedings, we conclude that the petitioner failed to overcome the presumption that McDonough's examination of Dunning fell within the wide range of acceptable performance. See *Strickland* v. *Washington*, supra, 466 U.S. 689 ("a court must indulge a strong presumption that counsel's conduct

---

[13] The following colloquy illustrates McDonough's efforts to impeach the credibility of Dunning by highlighting the nature of the deal he received from the state:

"[McDonough]: Why did it take you all these years to enter a guilty plea?

"[Dunning]: Trying to fight the best way I could. It didn't work in my favor, so I took the best option I could.

"[McDonough]: You were looking for a good deal from the state, weren't you?

"[Dunning]: Yes. . . .

"[McDonough]: But this is a better offer than they gave you previously, correct?

"[Dunning]: Yes.

"[McDonough]: What were you charged with originally?

"[Dunning]: Home invasion, burglary one, robbery one, larceny one, threatening one, kidnapping one.

"[McDonough]: And all those charges, other than [conspiracy to commit burglary in the first degree] have been—I guess they're not going to be pursued?

"[Dunning]: Yes."

falls within the wide range of reasonable professional assistance”).

We also agree with the habeas court and the respondent that the petitioner failed to demonstrate that McDonough’s decision not to object to the admission into evidence at trial of Dunning’s cooperation agreement with the state or that McDonough’s failure to ask that the court admit only a redacted copy of the agreement was objectively unreasonable or prejudicial to the petitioner. The petitioner argues that the cooperation agreement stated that Dunning had agreed to testify truthfully and that the same judge presiding over the petitioner’s criminal trial would determine whether Dunning’s testimony was credible. According to the petitioner, “[t]he lack of any follow-up from the trial court about Dunning’s credibility is likely to have misled the jury into concluding that the trial court found Dunning to be credible,” and, as a result, some jurors may have “abdicated their responsibility to independently evaluate Dunning’s credibility.” McDonough testified at the habeas trial that he did not seek redaction of the cooperation agreement because he did not want the jury wondering what may have been redacted. Rather than object outright to its admission, McDonough used Dunning’s cooperation agreement with the state to highlight his motivation for providing testimony against the petitioner, thereby impeaching his credibility. Moreover, the petitioner’s argument that McDonough’s failure to seek redactions of portions of the agreement somehow prejudiced the petitioner in the eyes of the jurors relies on unfounded speculation and, accordingly, we reject it. See, e.g., *Walker* v. *Commissioner of Correction*, supra, 230 Conn. App. 127 (“petitioner cannot rely on mere conjecture or speculation to satisfy either the performance or prejudice prong but must instead offer demonstrable evidence in support of his claim” (internal quotation marks omitted)).

C

The petitioner also argues that McDonough provided ineffective assistance by failing to move for the dismissal of all charges on the ground that the state had monitored and recorded his prison telephone calls during the period of time in which the petitioner was self-represented; see footnote 1 of this opinion; or to seek to suppress the state's use of those recordings, which the petitioner argues provided the state with insight into his trial strategy. We agree with the habeas court's determination that the petitioner failed to meet his burden of proof with respect to this claim.

McDonough testified at the habeas trial that, although he could not specifically recall the content of each of the phone recordings that were admitted into evidence, he remembered that the recordings contained conversations that would have been helpful to the prosecution. He stated that he did everything he could think of to keep the recordings from being admitted into evidence but that the court overruled his objections. When asked if he considered moving to dismiss the case or seeking a mistrial on the ground that the state's use of the recordings constituted an interference with the petitioner's right to prepare and present a defense, McDonough indicated that the petitioner had made some of the recordings before he was arrested. Moreover, McDonough stated that the petitioner had chosen to make the calls on an open line that the state was entitled to record and that self-represented litigants are permitted to make two legal calls per month that are not recorded.

On the basis of our review of the record, we conclude that the petitioner has failed to identify any evidence in support of his argument that the recordings admitted into evidence at trial potentially interfered with his right to prepare and present a defense and, thus, would have

provided the basis for McDonough to seek their suppression on that ground or a basis for a motion to dismiss or a postverdict motion. In his appellate brief, the petitioner clarifies that his argument regarding the admission of the phone recordings is limited "to those calls made while he was a self-represented litigant in the underlying criminal proceedings." It is undisputed that two of the recordings at issue were made prior to the petitioner's arrest on the charges at issue in this case when he was neither a self-represented party nor preparing a defense. A third recording occurred while the petitioner was represented initially by Attorney John Cizik, Jr., of the Office of the Public Defender. See footnote 2 of this opinion.

With respect to the two remaining phone call recordings, we agree with the respondent that the petitioner has not identified any specific portion of those recordings that potentially could have provided the state with insight into the petitioner's trial strategy, nor did the habeas court find that any portion of the recordings evinced such strategy, if it existed. Moreover, rather than reflect possible trial strategy, the two recordings that occurred during the period of time that the petitioner was self-represented formed the basis of the charge of tampering with a witness. The habeas court credited McDonough's testimony that, "in several of the recorded telephone calls, the petitioner requested others to convince Dunning to not testify against him and to come up with a false alibi for him. [McDonough] indicated that, although the state could not listen to the telephone calls of a [self-represented] litigant for purposes of assisting with its strategy, the state could use the petitioner's inculpatory statements that involved threatening and tampering with a witness."

To put it simply, we agree with the habeas court's conclusion that "[t]he credible evidence indicates that [McDonough] did attempt to suppress the telephone

calls, and the trial court had valid reasons for denying counsel's motion to do so. Moreover, the petitioner failed to prove that he was prejudiced by demonstrating that, had counsel taken additional steps in his attempt to exclude the recordings, he would have been successful and there is a reasonable probability that the outcome of the trial would have been different." Accordingly, we reject this aspect of the petitioner's ineffective assistance of counsel claim.

D

The petitioner's final argument in support of his ineffective assistance of counsel claim is that McDonough provided ineffective assistance by failing to object during the trial court's canvass of the petitioner regarding his waiver of his right to self-representation and the court's appointment of McDonough, when he was acting as standby counsel, to full counsel. We disagree.

The following additional facts are relevant to our consideration of this aspect of the petitioner's ineffective assistance of counsel claim. As previously noted, in January, 2017, shortly before his criminal trial was to begin, the petitioner filed a motion seeking to waive his right to self-representation and to have counsel appointed for him. The court, *Schuman, J.*, heard argument on the motion on January 13, 2017. After hearing from both parties, the court stated to the petitioner that he could either choose to continue to represent himself, or the court would appoint McDonough to represent him. The respondent stated: "I'll take the representation." The following colloquy ensued:

"The Court: All right. So, just to be clear—and I think I will ask a few other questions, but you would like me to appoint [McDonough] to represent you.

"[The Petitioner]: Well, I mean, I will prefer a different attorney, but as you emphasized that I can't choose,

which I'm not looking to choose, I'm just asking for new appointment of a different counsel in which I believe it would only take . . . a different attorney thirty days to go through the case as well.

"The Court: I don't know about that. But I just want to make sure now that you and—I realize that I haven't given you an unlimited choice, I've really given you two choices, but I just want to make sure that you're making this choice voluntarily . . . it's not the choice that you came to court seeking, but, given the choices I've given you, is anyone forcing you to waive your right to represent yourself?

"[The Petitioner]: Well, I'm not being forced, but I feel like I'm being forced to take the representation of this attorney—yes, I do.

"The Court: Well, then . . . I can't find that you're waiving your right to represent yourself . . . and I don't want to say that you've waived it unless you're doing so voluntarily because then . . . we'll be in trouble down the road.

"[The Petitioner]: To alleviate more complications, yes, I knowingly and intelligently waive my right to pro se representation.

"The Court: All right. And I just want to make sure you realize that once you do waive your right to represent yourself, you are entitled to appointment of competent counsel but that you can't then come back to court and say I want to represent myself again. Basically, you're giving up your right to represent yourself and agreeing to be represented by competent counsel. Do you understand that?

"[The Petitioner]: Yes, I do.

"The Court: Okay, all right, so then Mr. McDonough, I am going to appoint you to represent [the petitioner]— full appointment.

"[McDonough]: Yes, Your Honor."

"It is well established that [t]he right to counsel and the right to self-representation present mutually exclusive alternatives. A criminal defendant has a constitutionally protected interest in each, but since the two rights cannot be exercised simultaneously, a defendant must choose between them. When the right to have competent counsel ceases as the result of a sufficient waiver, the right of self-representation begins. . . . Put another way, a defendant properly exercises his right to self-representation by knowingly and intelligently waiving his right to representation by counsel. . . . State and federal courts consistently have discussed the right to self-representation in terms of invoking or asserting it . . . and have concluded that there can be no infringement of the right to self-representation in the absence of a defendant's proper assertion of that right." (Internal quotation marks omitted.) *State* v. *Paschal*, 207 Conn. App. 328, 333, 262 A.3d 893, cert. denied, 340 Conn. 902, 263 A.3d 387 (2021), cert. denied, U.S. , 142 S. Ct. 1395, 212 L. Ed. 2d 341 (2022).

The petitioner argues on appeal that, to the extent the trial court's canvass of him can be construed as requiring him to agree to give up his right to represent himself in the future in order to reassert his right to counsel, that was a legally incorrect canvass, and McDonough should have raised an objection to the canvass. The petitioner contends that McDonough's failure to do so constituted deficient performance that was prejudicial "because there is a reasonable probability that—had the court properly canvassed him—the petitioner would have invoked his right to [represent] himself at the criminal trial." The petitioner further maintains that this court should presume prejudice because his having to proceed to trial with counsel when he wanted to represent himself amounted to structural error.

The petitioner has provided no authority for the proposition that McDonough had any duty or obligation under the sixth amendment to object to the trial court's canvass, or that the court would have permitted him to do so. At the time the court conducted the canvass, the petitioner was self-represented and McDonough was standby counsel. More importantly, the petitioner's insistence that he would have represented himself at trial had he been permitted to do so is belied by the record. Specifically, prior to trial, the court conducted a hearing on a motion McDonough had filed to withdraw from representing the petitioner on the basis of the petitioner's expressed dissatisfaction with McDonough's representation. In addition to hearing from both counsel, the court heard from the petitioner, who stated on the record that he would like the court to grant McDonough's motion. When the court asked the petitioner what he would like to happen if McDonough were allowed to withdraw, the petitioner told the court that he would like new counsel appointed. He did not ask to proceed to trial as a self-represented party.

We agree with the respondent that this colloquy illustrates the petitioner's clearly expressed desire to be represented by counsel at trial. He cannot now claim that he was prejudiced by not being able to represent himself because he has failed to show that he would have chosen to do so. We conclude that the habeas court properly denied this aspect of the petitioner's claim of ineffective assistance on the ground that the petitioner never asserted his right to self-representation after McDonough was appointed to represent him; see *State* v. *Paschal*, supra, 207 Conn. App. 333; and no credible evidence was presented to the habeas court that the petitioner believed that he irrevocably had given up the right to self-representation as a result of the trial court's canvass.

### III

Finally, the petitioner argues that the habeas court improperly excluded as irrelevant Dunning's proffered testimony at the habeas trial that the handgun used during the commission of the underlying crimes was fake. The respondent asserts that the court properly exercised its discretion by refusing to consider speculative testimony regarding the gun's authenticity.

The following additional facts and procedural history are relevant to our resolution of this claim. As discussed in part II B of this opinion, the petitioner argued in support of his claim of ineffective assistance of criminal trial counsel that counsel had failed "to adequately cross-examine, impeach, or otherwise undermine" Dunning's credibility. Footnote 3 of this opinion. Dunning had testified at the criminal trial that Le supplied the gun that was used during the home invasion and that Dunning was the person who held the gun pointed at the victim throughout the incident. The victim testified at the criminal trial, consistent with Dunning, that one of the perpetrators had stayed with him at all times with a gun pointed at him. When asked to describe the gun, the victim stated that it was "definitely not a revolver" and that he believed it was a semiautomatic weapon. The petitioner did not raise as a defense that the gun used was not a weapon "from which a shot may be discharged"; General Statutes § 53a-3 (6); nor was any evidence presented during the criminal trial that the gun used during the home invasion was inoperable. Additionally, among the items that were taken from the victim's home and in possession of the perpetrators during the home invasion were two long guns. The victim provided testimony about the long guns, including that they were operable.

At the habeas trial, the petitioner sought to elicit testimony from Dunning on direct examination that the

weapon used during the home invasion was not a "real gun . . . ." The following colloquy ensued:

"[The Petitioner's Counsel]: Okay. Did—did the—did you have a real gun during the home invasion?

"[Dunning]: No.

"[The Respondent's Counsel]: Objection.

"The Court: Okay. So, wait a minute, Mr. Dunning. So, the objection?

"[The Respondent's Counsel]: Relevance.

"The Court: So, what's the relevance, Attorney?

"[The Petitioner's Counsel]: Your Honor, the relevance is, I believe, [Dunning] would testify that it's a fake gun. It's alluded to throughout the transcripts that, I believe, that's what he testified to at trial. I—I believe [the prosecutor] makes reference to it, although I couldn't be 100 percent sure of that. But it's relevant because the—[petitioner] was sentenced in accordance with the robbery in the first degree and the home—and the home invasion sentencing enhancement, involving the use or threat of a gun that's capable of firing a shot. So, I'm trying to figure out what kind of fake gun it is.

"The Court: All right. So, I'm going to sustain the objection. We've already had the trial; we're not retrying here. We're—you know, your claims are regarding ineffective assistance of counsel and due process claims, but.

"[The Petitioner's Counsel]: Yes.

"The Court: So—

"[The Petitioner's Counsel]: The—the only relevance, I'll just offer—and I understand the objection was sustained, but just for—for the record, is that, had [McDonough] further explored whether the gun was fake, it's

possible that he could have objected or moved for— made various motions regarding, you know, whether [the petitioner] was not—

"The Court: All right. So, you're testifying now.

"[The Petitioner's Counsel]: Okay.

"The Court: So, the—

"[The Petitioner's Counsel]: Well—

"The Court: Your exception is noted . . . .

"[The Petitioner's Counsel]: Thank you, Your Honor."

Our standard of review and governing legal principles regarding evidentiary claims are well settled. "We review the [habeas] court's decision to admit [or exclude] evidence, if premised on a correct view of the law . . . for an abuse of discretion. . . . We will make every reasonable presumption in favor of upholding the [habeas] court's ruling, and only upset it for a manifest abuse of discretion. . . . The [habeas] court has wide discretion to determine the relevancy [and admissibility] of evidence . . . . In order to establish reversible error on an evidentiary impropriety . . . the [petitioner] must prove both an abuse of discretion and a harm that resulted from such abuse." (Internal quotation marks omitted.) *Glen S.* v. *Commissioner of Correction*, 223 Conn. App. 152, 161–62, 307 A.3d 951, cert. denied, 348 Conn. 951, 308 A.3d 1038 (2024).

"Evidence that is not relevant is inadmissible. . . . Evidence is relevant if it has any tendency to make the existence of any fact that is material to the determination of the proceeding more probable or less probable than it would be without the evidence. . . . Relevant evidence is evidence that has a logical tendency to aid the trier in the determination of an issue." (Internal quotation marks omitted.) *Spearman* v. *Commissioner of Correction*, 164 Conn. App. 530, 576, 138 A.3d 378,

cert. denied, 321 Conn. 923, 138 A.3d 284 (2016). "It is the obligation of the party seeking to have the evidence admitted to demonstrate its relevance to the habeas court. . . . Unless such a proper foundation is established, the evidence . . . is irrelevant." (Citation omitted; internal quotation marks omitted.) *Angel C.* v. *Commissioner of Correction*, 226 Conn. App. 837, 846, 319 A.3d 168, cert. denied, 350 Conn. 908, 323 A.3d 1091 (2024).

As charged in the present case, § 53a-134 (a) (2) required proof that a defendant was "armed with a deadly weapon" during the commission of a robbery. The phrase, "armed with a deadly weapon," means that a defendant physically possessed a weapon, "whether loaded or unloaded, from which a shot may be discharged . . . ." General Statutes § 53a-3 (6); see *State* v. *Edwards*, 325 Conn. 97, 143, 156 A.3d 506 (2017).

We agree with the respondent that the petitioner has failed to establish that the habeas court's decision not to admit Dunning's testimony on relevance grounds amounted to a manifest abuse of its discretion. When asked by the court to explain how the inquiry into the nature of the handgun Dunning used during the home invasion or its operability was relevant, issues not raised or contested during the criminal trial, the response by the petitioner's counsel was equivocal at best. He admitted that he was unsure whether there was anything in the criminal trial record that would support such an inquiry. The operability of the handgun, however, was not an essential part of the state's case. For the conviction under § 53a-134 (a) (4), there was no requirement that the perpetrator be armed with an *operable* firearm. The only requirement is that the perpetrator display or threaten to use something that, by

word or deed, he represents to be a firearm.[14] It was also not necessary for the state to show that the handgun used, which was never recovered, was operable to support a conviction under § 53a-134 (a) (2). Under that subsection, the state needed to show only that the perpetrators were "armed" with, meaning in possession of, an operable firearm. See, e.g., *State* v. *Anderson,* 178 Conn. 287, 294, 422 A.2d 323 (1979) (explaining that "armed" is commonly interpreted as requiring that weapon be in one's possession and, thus, "it is not necessary for a weapon to be exhibited, displayed, utilized or referred to in order for one to be considered 'armed' "). Evidence was admitted at trial through the victim's testimony that the perpetrators had in their possession the victim's long guns, which they stole during the home invasion, and that the victim had recently used those guns, from which the jury could reasonably infer operability. See, e.g., *State* v. *Jarmon*, 195 Conn. App. 262, 268, 224 A.3d 163 (operability of firearm can be proven by either circumstantial or direct evidence), cert. denied, 334 Conn. 925, 223 A.3d 379 (2020).

Finally, to the extent that testimony regarding the gun used during the home invasion may have been relevant to the petitioner's claim that McDonough was ineffective because he failed to argue that the home invasion and robbery were not accomplished using a firearm; see footnote 3 of this opinion; the habeas court determined that the petitioner had later abandoned that claim, and he has not challenged that aspect of the court's decision. Accordingly, even if the inquiry were relevant, the court's exclusion of Dunning's testimony regarding the gun was harmless.

The judgment is affirmed.

In this opinion the other judges concurred.

[14] Although a defendant could raise as an affirmative defense that the firearm used in a criminal offense was not a weapon from which a shot could be discharged; see General Statutes § 53a-3 (6); the petitioner never asserted this defense in the criminal proceedings.